**Samuel J. ABATE, William Darden, Robert Frankl, Edward Graybow, Jean Claude Mehu and Wilfredo Olverio, Plaintiffs,**

v.

**The ROCKLAND COUNTY LEGISLATURE, John T. Grant as County Executive, Bruce Levine as Chairman of the Rockland County Legislature, Rockland County, Shirley Huested and Frances McCormack as Commissioners of the Rockland County Board of Elections, Edward Gorman as Rockland County Clerk, Defendants.**

No. 93 CIV. 6655(JSR).

United States District Court,
S.D. New York.

May 16, 1997.

---

**818**

＠ー38

Samuel J. Abate Jr., Beatie, King & Abate, New York, NY, for plaintiffs.

Paul V. Nowicki, County Attorney, County of Rockland (Edwin L. Whitman, of Counsel), New City, NY, for defendants.

## OPINION AND ORDER

RAKOFF, District Judge.

In a case of local legislative apportionment, as elsewhere, an experiment must eventually be judged by its results; and if federal courts need to be receptive to "innovation, experiment, and development among units of local government," they have a correlative duty to make sure that the results do not exceed constitutional limits.[1] In 1971, the Supreme Court, despite misgivings, gave tentative approval to Rockland County's newly-promulgated experiment in apportionment, concluding that special local factors justified the plan's 11.9% deviation from "one-person/one-vote" equality. *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). But at the same time the Court cautioned that "nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality." *Id.* at 187, 91 S.Ct. at 1908.

Assessing the results a quarter century later, this Court finds that the unusual historical circumstances that gave rise to the Rockland County experiment have substantially dissipated, while the deviation from equality inherent in the Rockland County plan has increased to 19.8% and gives every indication of increasing further. As a result, the plan no longer passes constitutional muster and must give way to prompt reapportionment.

### Legal And Factual Background

The findings of fact and conclusions of law that have led the Court to these determinations are set forth in the following Opinion. They reflect not only the Court's review of the parties' documentary submissions[2] but also its resolution of the testimonial conflicts among the prominent Rockland County officials called as witnesses at the recent bench trial of this case.[3] At the outset, however, it

---

1. *Avery v. Midland County,* 390 U.S. 474, 485, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968). *See also New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting); *but cf.* Rubin and Feeley, *Federalism: Some Notes On A National Neurosis,* 41 U.C.L.A. L.Rev. 903, 923–26 (1994).

2. The Court compliments the parties' able counsel for the helpfulness of those submissions.

3. Those witnesses, in the order in which they testified, were: Bruce M. Levine, former Rockland County Legislator from the Town of Ramapo, former Chairman of the Rockland County Legislature, and formerly a defendant in this lawsuit until dismissed on plaintiff's motion, *see*

is well to review certain guiding principles that none of the parties disputes.

On the one hand, "more flexibility [is] constitutionally permissible with respect to state [or local] legislative reapportionment than in congressional redistricting." *Mahan v. Howell*, 410 U.S. 315, 321, 93 S.Ct. 979, 983, 35 L.Ed.2d 320 (1973). On the other hand, "a state's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Id.* at 326, 93 S.Ct. at 986. Accommodation of these objectives is achieved through a presumption sometimes referred to as the "ten-percent rule." Where a state or local apportionment plan deviates from equality by less than 10%, it is presumptively constitutional, and a challenger has the burden of proving that even such "minor deviation" is the result of discriminatory state action. Conversely, a plan with a deviation of more than 100% "creates a prima facie case of discrimination and therefore must be justified by the state." *Brown v. Thomson*, 462 U.S. 835, 843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983). Moreover, "[b]ecause voting rights require highly sensitive safeguards," state interests offered to justify deviations from equality must be "carefully scrutinized" by the courts. *Abate*, 403 U.S. at 185, 91 S.Ct. at 1906. Even substantial state interests may not justify material deviations if, for example, the interests are not meaningfully furthered by the apportionment plan at issue, *see Mahan*, 410 U.S. at 326, 93 S.Ct. at 986, or if, in appropriate circumstances, another plan could effectuate the same state interests while minimizing the degree of deviation from equality, *see Kilgarlin v. Hill*, 386 U.S. 120, 123–24, 87 S.Ct. 820, 822–23, 17 L.Ed.2d 771 (1967).

While agreed on these principles, the parties disagree at the threshold as to what mathematical formula properly measures the percentage of deviation from equality in the particular circumstances of this case. To understand, and resolve, this initial dispute, it is first necessary to outline the history of the Rockland County apportionment plan and its peculiar mathematics.

Rockland County, situated roughly 20 to 30 miles north of Manhattan, is the smallest geographically of New York State's 62 counties outside the boroughs of New York City. Tr. 40.[4] Largely rural until the completion of the Tappan Zee Bridge across the Hudson River in the late 1950's, the County is now increasingly suburban. Tr. 39–40, 177. It is divided geographically into five areas known as Towns: Clarkstown, Haverstraw, Orangetown, Ramapo, and Stony Point. It is also divided into school districts, the borders of which do not necessarily correspond to town boundaries, and also includes numerous villages and other municipal units, several of which cross town boundaries. Tr. 38–41, 74.

For at least a century prior to 1970, Rockland County was governed by a Board of Supervisors, consisting of the elected supervisors of each of the County's five constituent towns. *Abate*, 403 U.S. at 183, 91 S.Ct. at 1905–06. Since, however, the populations of the respective towns differed greatly in size, this arrangement was no longer tenable (at least in its pristine form) once the Supreme Court, in its 1968 decision in *Avery, supra,* held that the one person/one vote doctrine extended to local units of state government. Accordingly, in 1969, the Board of Supervisors was disbanded (partly in response to

Trial Transcript ("Tr.") at 27; Edward J. Clark, former Rockland County Legislator from the Town of Orangetown; Thomas Morahan, Rockland County Legislator from the Town of Clarkstown and current Chairman of the Rockland County Legislature; Samuel J. Abate, Mayor of the Village of Sloatsburg in the Town of Ramapo and lead plaintiff both in this case and in the previous *Abate* litigation in 1971; Kenneth R. Ingenito, former Rockland County Legislator from the Town of Stony Point; Patrick J. Moroney, Rockland County Legislator from the Town of Orangetown; Howard Phillips, Rockland County Legislator from the Town of Haverstraw; Ilan Schoenberger, Rockland County Legislator from the Town of Ramapo; and Robert Frankl, Mayor of the Village of Wesley Hills in the Town of Ramapo and a co-plaintiff in this case.

**4.** *See also* R.E. Johnson, An Analysis of Weighted Voting as Used in Reapportionment of County Governments in New York State, 34 Albany L.Rev. 1, 4 (1969).

local apportionment litigations[5]) and replaced by a directly-elected Rockland County Legislature. See Rockland County Board of Supervisors, Resolution No. 311—Adoption of Plan Providing for Reapportionment for Rockland County (June 24, 1969) (the "Plan"). The avowed purpose of the Plan was "maintaining the traditional and historic relationship between town and County governments consistent with the constitutional requirement for equal representation," by (a) making the County legislative districts coterminous with "the boundaries of the existing towns" and (b) permitting elected town officials, and specifically town supervisors, to "also serve as members of the County Legislature." Id. More precisely, as the Supreme Court found, the purpose was "to encourage town supervisors to serve on the county board," Abate, 403 U.S. at 187, 91 S.Ct. at 1908, and thus preserve the interlocking nature of town and county governments.

To accomplish this without patent malapportionment, the Plan provided that the town-district with the smallest population (Stony Point) would elect one representative to the County Legislature and that each of the other four town-districts would elect, on a town-wide basis, the number of representatives equal to the quotient—rounded to the nearest integer—of that town's population divided by the population of the smallest town. Plan at § 5. The Plan further provided for these calculations to be recomputed after each official federal census. Id.

Even as initially applied, the "rounding-off" aspect of the Plan effectively diluted the voting strength of the voters in some towns as compared with the voters in other towns. For example, Orangetown, with 4.3 times the population of Stony Point, was accorded four representatives in the first Rockland County Legislature, while Clarkstown, with 4.8 times the population of Stony Point, was assigned five representatives. See Abate, 403 U.S. at 184 n. 1, 91 S.Ct. at 1906 n. 1. Compared with the voters of Stony Point, therefore, the vot-

ers of Orangetown were underrepresented and the voters of Clarkstown were overrepresented. Measuring these effects by the "traditional" formula (described below), the Supreme Court calculated the maximum "deviation" from equality as 11.9%.

Inherent in the "rounding-off" aspect of the Rockland County Plan, moreover, was the potential for still larger deviations, depending on the fortuity of the ratios between the populations of the various towns. If, hypothetically, the smallest town had a population of 10,000, a second town had a population of 14,999, and a third town had a population of 15,001, the Rockland County Plan would accord one representative to the second town and two representatives to the third town—with the result that the voters of the second town would elect half as many county legislators as the nearly identical number of voters of the third town while simultaneously having one-third less voting power than the voters in the first town.

The County now concedes that the "mathematical realities" of the Rockland County Plan dictate "relatively large deviations." Defendants' Memorandum of Law In Opposition To Plaintiffs' Motion For Summary Judgment, at 17–18. Still, as of 1971, the Supreme Court, mindful of the new and experimental nature of the Rockland County Plan, did not view such potential (albeit inherent) problems as ripe for adjudication. As the Supreme Court stated: "we express no opinion on the contingency that, in future years, the Rockland County plan may produce substantially greater deviations than presently exist. Such questions can be answered if and when they arise." Abate, 403 U.S. at 186 n. 3, 91 S.Ct. at 1907 n. 3.

The peculiar mathematics of the Rockland County Plan also carried a significant potential for forcing the County to greatly expand the size of the County Legislature or face still further deviations from equality. This could happen if the rest of the County grew at a faster rate than its smallest town,[6] and it

5. See Abate v. Mundt, Index No. 2845/1968 (Sup. Ct. Rockland County, 1968).

6. Between 1969 and 1990, the population of Stony Point increased by only 700 persons, from 12,114 to 12,814, or, in percentage terms, by less

than 6%, while the population of Rockland County as a whole increased during the same period from 218,804 to 265,475, a percentage increase of more than 21%. See Abate, 403 U.S. at 184 n.

could also happen if the unpredictable deviations created by "rounding off" became so unacceptably large that the Plan could be constitutionally saved only by doubling or tripling the size of the legislature so as to reflect more precisely the actual ratios between the towns.[7]

Thus another difficulty with the Rockland County Plan was that it created an inherent tension between keeping the County Legislature at a manageable size and keeping deviations from voter equality within acceptable limits. Again, the County now concedes this point, stating that "when the smallest possible legislature is based upon a multi-member district plan in which each town has at least one legislator, the total deviation is inevitably going to be relatively large." Def. Mem., *op. cit.*, at 17. Once again, however, while this difficulty was to some extent noticeable from the outset of the Plan, in that the newly-created County Legislature consisted of 18 members compared with the five members of the previously-existing Board of Supervisors, the Supreme Court chose not to address this difficulty in its initial review of the plan in *Abate*, presumably because the problem had not yet ripened to constitutional significance. But the problem persisted—becoming far more obvious, and serious, in subsequent years.

First, in 1981, as a result of the population changes in the County reflected in the 1980 federal census, the Rockland County Board of Elections certified that, if no changes were made in the apportionment of the County

Legislature, the deviation from equality (which the Board at all times calculated under the "traditional" formula, *infra*) would increase from 11.9% to 26.4%. *See English v. Lefever*, 110 Misc.2d 220, 442 N.Y.S.2d 385 (Sup.Ct. Rockland Cty., 1981). Only by increasing the size of the County Legislature to 21 was the County able to reduce the deviation to a figure of 17.8%, which a reviewing state court found barely acceptable.[8]

Subsequently, as a result of the 1990 census, the County Legislature was advised that even to keep the degree of deviation at or slightly below the 17.8% figure approved by the state court in the *English* case, the size of the Legislature would have to be increased to 23 members, and that in order to reduce the degree of deviation below the 10% figure used for measuring "prima facie" unconstitutionality, the size of the Legislature would have to be increased to no less than 42 members. *See* Affidavit of Edwin L. Whitman, Esq., sworn to September 12, 1996 ("Whitman Aff.") at 6–9 and Ex. D. The Legislature chose, instead, not to reapportion, concluding in effect that the County interests justified an even greater deviation from equality than previously permitted. Rockland County Res. No. 156 of 1993 Declaring This Legislature to be Appropriately Apportioned, Apr. 7, 1993 (Whitman Aff., Ex. E).[9] This lawsuit followed.[10]

### Extent of Malapportionment

Against the preceding background, the Court must first determine the measure

---

1, 91 S.Ct. at 1906 n. 1 *and* Joint Pretrial Order at ¶ 5.

7. If, for example, the original Plan had accorded three county legislative seats to Stony Point (instead of one), then Orangetown, with 4.3 times as many people, and Clarkstown, with 4.8 times as many people, would have been given 13 seats and 14 seats respectively. By more accurately reflecting the actual population ratios between the towns, this would have led to a decrease in the deviation from equality; but the total size of the County Legislature, instead of being 18, would have increased to 54. *See Abate*, 403 U.S. at 184 n. 1, 91 S.Ct. at 1906 n. 1, for the raw data from which these figures can be derived.

8. The convoluted history of this increase to 21 members, which occurred in two stages and with many intervening detours, is set forth in three

unreported decisions of the trial court in *English v. Lefever, supra*, respectively dated May 24, 1982, June 22, 1983, and June 8, 1984, certified copies of which have been kindly supplied by County counsel and made part of the record of this case.

9. Plaintiffs contend that the promulgation and passage of this resolution did not comply with requisite notice and hearing provisions of state and local law. *See e.g.*, Tr. 36, 79–80.

10. Plaintiffs are residents and voters in the Town of Ramapo, the town whose voters, under any method of calculation, are the most underrepresented in the County Legislature. *See* Tr. 163. Their standing to bring this action is clear, *see Roxbury Taxpayers Alliance v. Delaware County Board of Supervisors*, 80 F.3d 42, 47 (2d Cir. 1996), and, indeed, uncontested.

and extent of the Rockland County Legislature's current deviation from voter equality. Plaintiffs urge that this calculation be made in accordance with what all parties correctly refer to as the "traditional" formula, *see* Joint Pretrial Order at ¶¶ 6–7. The traditional formula calculates the extent of deviation by first dividing the total population of the governed community (here, Rockland County, with a 1990 census population of 265,475) by the total number of legislators (here, 21), thereby yielding an ideal population number (here, 12,642) that should be represented by each legislator if there were complete voter equality. This ideal number is then compared with the population actually represented by each member of the County Legislature (here, the population of the particular town-district the member represents), with the percentage of difference indicating the percentage of deviation from equality.

Application of this formula to the current Rockland County Legislature yields the following figures: [11]

| TOWN | 1990 CENSUS POPULATION | NO. OF REPS | % DEVIATION FROM EQUALITY |
|---|---|---|---|
| Stony Point | 12,814 | 1 | −1.36 |
| Haverstraw | 32,712 | 3 | +13.75 |
| Orangetown | 46,742 | 4 | + 7.56 |
| Clarkstown | 79,346 | 6 | −4.61 |
| Ramapo | 93,861 | 7 | −6.07 |

The difference in effective voting power between the most underrepresented voter and the most overrepresented voter then yields a measure of what the Supreme Court in *Abate* called the "total deviation from population equality." *See Abate*, 403 U.S. at 184, 91 S.Ct. at 1906. This figure is 19.8% (*i.e.* the range between a Haverstraw voter's overrepresentation of +13.75% and a Ramapo voter's underrepresentation of –6.07%), which constitutes a two-thirds increase over the 11.8% deviation (calculated by the same formula) that the Supreme Court found problematic in 1971 when it first assessed the nascent Rockland County Plan in *Abate*. It is this 19.8% figure that plaintiffs contend should form the basis for all further analysis in this case.

Defendants, however, argue that a better measure of deviation in this case can be derived from the different formula utilized by the district court in *Roxbury Taxpayers Alliance v. Delaware County Board of Supervisors*, 886 F.Supp. 242 (N.D.N.Y.1995), *aff'd*, 80 F.3d 42 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996). *Roxbury* involved another county of New York State, Delaware County, which responded to the Supreme Court's one per-son/one vote mandates, not (as Rockland County) by disbanding its Board of Supervisors, but rather by "weighting" the voting power of each supervisor serving on the Board to correspond to the relative population of the town which that supervisor represented as compared to the population of the county as a whole. For example, the supervisor representing the town of Bovina, which has 1.17% of Delaware County's population, casts 39 of the Board's 3480 votes, or 1.12% of the total Board votes. *See Roxbury*, 80 F.3d at 45.

Unlike simple redistricting, which is the method of apportionment used by the great majority of New York State's counties, *see* Tr. 346–47 and Plaintiffs' Trial Ex. 2, the weighted voting approach, which is used by most of the remaining counties, *id.*, preserves the historic interlocking of town and county governance. *Roxbury* affirmed the overall constitutionality of this voting approach. *See Roxbury*, 80 F.3d at 48–49. But since under the Delaware County plan each representative's number of votes in the legislature is expressed in whole numbers, rather than fractions, the potentiality for some deviation from perfect equality still exists, and this was also at issue in *Roxbury*. To calculate the

---

11. Joint Pretrial Order at ¶¶ 4, 7. The form of the chart corresponds to the form used by the Supreme Court in *Abate*, 403 U.S. at 184 n. 1, 91 S.Ct. at 1906 n. 1.

extent of such deviation in this context, the district court in *Roxbury* utilized a method of calculation (previously endorsed by the Court of Appeals in another "weighted voting" case, *League of Women Voters v. Nassau County Board of Supervisors,* 737 F.2d 155, 171 (2d Cir.1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985)), in which the percentage of the county's total population represented by a given member of the county legislature is compared with the percentage of the legislature's total votes allocated to that member. Applying this "weighted voting" method of calculation in *Roxbury,* the district court calculated that total deviation was less than 1% and thus, as the Court of Appeals found, "certainly within constitutional limits." *Roxbury,* 80 F.3d at 49.

Defendants in the instant case contend that the Rockland County apportionment plan is "like" a weighted voting plan in that each of the larger towns, although not electing a single representative who has multiple votes in the county legislature, elects multiple members to represent the town in that legislature. Therefore, defendants argue, deviation here should be calculated according to something akin to the "weighted voting" method, that is, by comparing the percentage of the county legislature's representatives elected by a given town to that town's percentage of the total county's population. Since, according to the 1990 census, Rockland County has a total population of 265,475, Ramapo, the largest (and most underrepresented) town should, with a population of 93,861, be entitled on this approach to 35.36% of the representatives in the 21–member Rockland County Legislature; but, in fact, with its seven representatives it has only 33.33%, or a deviation (under this method) of –2.03% (*i.e.* 33.33% minus 35.36%). By contrast, Haverstraw, the second smallest (and most overrepresented) town, with a population of 32,712, should, on this approach, be entitled to 12.32% of the representatives of the Legislature; instead, it has three representatives out of 21, or 14.29%, resulting in a deviation (under this method) of +1.97% (*i.e.,* 14.29% minus 12.32%). Thus, on this analogy to the "weighted voting" methodology, Ramapo is –2.03% underrepresented,

Haverstraw is +1.97% overrepresented, and the total deviation from equality (*i.e.,* the range between the two figures) is 4%— which, defendants argue, is presumptively well within constitutional limits.

While Justice Frankfurter long ago warned that the lower courts would be drawn into a "mathematical quagmire" if the Supreme Court did not fix a clear "legal calculus" for measuring malapportionment, *see Baker v. Carr,* 369 U.S. 186, 268, 82 S.Ct. 691, 738, 7 L.Ed.2d 663 (1962) (Frankfurter, J., dissenting), the Court has avoided so doing in cases involving state or local legislatures, apparently for fear that it would be drawn into an "imbroglio of mathematical manipulation," *Mahan,* 410 U.S. 315, 319 n. 6, 93 S.Ct. 979, 982, 35 L.Ed.2d 320 (1973). In the instant case, however, this Court concludes without difficulty that the "traditional" formula, rather than defendants' modified "weighted voting" formula, provides the proper measure of deviation from voter equality. The Supreme Court itself effectively so determined in *Abate,* when it used the traditional formula to measure deviation in the original Rockland County Plan. That determination controls here.

Moreover, even though the Supreme Court "has declined to set forth a definitive formula for measuring deviation on the local level," *Roxbury,* 80 F.3d at 49, the Court has repeatedly utilized the traditional formula in a wide spectrum of local apportionment cases, *see, e.g., Bd. Of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989); *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), while the Court appears *never* to have utilized the "weighted voting" formula, modified or otherwise, in any case whatever. Likewise, courts in the Second Circuit have regularly utilized the traditional method in a variety of local apportionment cases, *see, e.g., Morris v. Bd. Of Estimate,* 831 F.2d 384 (2d Cir.1987), *aff'd* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989); *Jackson v. Nassau County Bd. Of Supervisors,* 818 F.Supp. 509 (E.D.N.Y.1993), while *never* utilizing the weighted voting formula outside the weighted voting cases for which it was specifically

devised. *See, e.g., Roxbury, supra; League of Women Voters v. Nassau County Bd. Of Supervisors,* 737 F.2d 155 (2d Cir.1984).

Defendants' notion that the weighting voting formula can appropriately be transposed to the Rockland County situation is also logically unsound. In the classic weighted voting situation, a town supervisor's voting power in the county legislature is equal to his town's percentage of the county's population. By contrast, under the Rockland County Plan, the voting power of an individual county legislator elected at-large from any of the multi-member town-districts is only a fraction of his town's percentage of the county's population. But the "weighted voting" formula measures deviations by comparing entire towns. Thus, unless all the Rockland County legislators from a given town happen to vote as a bloc (which they are free to do or not do as they choose), the electoral power of a given voter in any such multi-member town bears no direct correlation to the deviations measured by the weighted voting method.[12] Accordingly, while the weighted voting formula directly measures the extent to which a weighted voting plan is achieving the equality it is designed to achieve, it has only indirect applicability, at best, to the Rockland County Plan.

Finally, defendants' proposal to substitute a weighted voting formula for the traditional formula simply misses, or obscures, both of the basic reasons for calculating deviation in this case. One reason is to determine whether or not a "prima facie" case of unconstitutionality has been made out under the so-called "ten percent rule," *supra.* Because that rule was formulated entirely on the basis of the traditional method of calculating deviation, *see, e.g., Voinovich v. Quilter,* 507 U.S. 146, 160, 113 S.Ct. 1149, 1158–59, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2695–96, 77 L.Ed.2d 214 (1983), using any other method for this purpose would be entirely inconsistent, improper, and misleading.

An even-more fundamental reason for calculating deviation in this case is to determine whether inequality under the Rockland County Plan has substantially increased since 1970. For this purpose, it does not necessarily matter which method of calculation is used as long as the same method is used consistently throughout. If that is done, it is clear under any formula that the extent of malapportionment in the Rockland County Legislature has greatly increased since its inception in 1969. Under the traditional formula, as previously noted, it has increased by two-thirds, *i.e.,* from a traditional-formula deviation of 11.9% to a traditional-formula deviation of 19.8%. But even under defendants' modified weighted voting formula, which by its very methodology vastly deflates the gross measure of deviation, malapportionment has still increased by at least one-third, from a weighted-voting deviation of 2.9% to a weighted-voting deviation of 4%.[13]

As earlier noted, the County has previously conceded that the "mathematical realities"

---

12. At trial, defendants' counsel alleged, without evidentiary or other support, that legislators in Delaware County can "split" their weighted votes, rather than having to vote them as a bloc. Tr. 20. Clearly the Court of Appeals assumed otherwise, *see Roxbury,* 80 F.3d at 44; but even assuming *arguendo* that the Court was erroneous in that assumption, it would simply tend to show that the weighted voting formula used in that case was inappropriate even there, not that it has any applicability here.

13. The derivation of the 4% figure for 1990 has already been set forth earlier in this opinion. The 2.9% figure was calculated in the following manner, using the raw data from the Supreme Court's opinion in *Abate:*

| | 1969 Pop. | % of Pop. | # of Reps. | % of Reps. | Deviation |
|---|---|---|---|---|---|
| Stony Point | 12,114 | 5.54% | 1 | 5.55% | 0.01% |
| Haverstraw | 23,676 | 10.82% | 2 | 11.11% | 0.29% |
| Orangetown | 52,080 | 23.80% | 4 | 22.22% | −1.58% |
| Clarkstown | 57,883 | 26.45% | 5 | 27.77% | 1.32% |
| Ramapo | 73,051 | 33.39% | 6 | 33.33% | −0.06 |

Total Deviation by the "Weighted Voting" Method =

+1.32% − (−1.58%) = 2.9%

of its Plan insure that "relatively large deviations" will "inevitably" occur. Def.Mem., *op. cit.*, at 17. Now that the inevitable has been realized, the County may not evade its burden of justification by resort to mathematical gamesmanship. Indeed, wholly apart from any issue of burden or presumption, Rockland County's "substantially [increased] deviations from population equality," *Abate*, 403 U.S. at 187, 91 S.Ct. at 1908, require this Court, under any approach, to very carefully scrutinize any state interests supposed to justify such malapportionment.

### Purported Justifications

■ What are these supposed justifications? In its original resolution promulgating the Rockland County Plan, *see supra*, the County, through its then Board of Supervisors, sought to justify the Plan's initial deviation from equality by expressing a desire to maintain the historic interlocking of town and county governments. This was not simply a matter of "close cooperation" between the respective governments, nor would such have been a sufficient justification. As the Supreme Court stated in *Abate*, "because almost all governmental entities are interrelated in numerous ways, we would be hesitant to accept this justification by itself." *Abate*, 403 U.S. at 186, 91 S.Ct. at 1907. Rather, what the original resolution and Plan emphasized, and what the Supreme Court determined was ultimately "significant," was the fact "that Rockland County has long recognized the advantages of having the same individuals occupy the governing positions of both the county and its towns." *Id.* Placing this in historical perspective, the Court noted that:

> For over 100 years, the five town supervisors were the only members of the county board, a system that necessarily fostered extensive interdependence between the towns and their county government. When population shifts required that some

towns receive a greater portion of seats on the county legislature, Rockland County responded with a plan that substantially remedies the malapportionment and that, by preserving an exact correspondence between each town and one of the county legislative districts, continues to encourage town supervisors to serve on the county board.

*Id.* at 186–87, 91 S.Ct. at 1907–08. Lest there be any doubt that this interlock was crucial to the Court's determination, the Court concluded by stating that "[w]e emphasize that our decision is based on the long tradition of overlapping functions and dual personnel in Rockland County government...." *Id.* at 187, 91 S.Ct. at 1908.[14]

In 1993, however, the Rockland County Legislature flatly repudiated this "two-hat" interlocking arrangement on which the Court in *Abate* had so fully relied as a justification for the Plan's substantial deviation from voter equality. Specifically, the County Legislature enacted Rockland County Local Law No. 6 of 1193, which amended the Rockland County Administrative Code so as to provide that "Notwithstanding the provision of any local law, resolution or other act of the former Board of Supervisors or of the Legislature of Rockland County, an elected county official may not at the same time hold any other elective town or village office."[15] In enacting this law, the County Legislature not only removed the factual keystone of the Supreme Court's analysis in *Abate*, but also materially modified, if not entirely rejected, the County's historic policy favoring interlocking town and county governments. *See* Tr. 87–88. Thus, reliance on such a policy no longer provides adequate justification for the County's malapportionment, at least in the manner that the Supreme Court found significant.

14. As previously noted, the Court was careful to immediately add that "nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality." *Id.*

15. A copy of the local law and of the relevant provisions of the county administrative code are

included in the record of this case. Because county legislators are elected for four-year terms, the new law further provided that, as to incumbents elected prior to February 1, 1994, the prohibition on dual service would not take effect until January 1, 1998.

In its place, the County, at the outset of the trial of this case, made the following proffer (at Tr. 24):

At trial, the County will present evidence that the current structure of the County Legislature, even with a total deviation of 19.8 percent, if that's what should be the Court's finding, that the present structure is justified by the following valid policies and interests:

One, historical considerations.

Two, that compactness and contiguity of the legislative districts.

Three, the desire to maintain the integrity of political subdivisions within the County legislature.

Four, the desire to have a small enough county legislature to allow for effective performance in close cooperation with the towns on county-wide programs. Evidence of such close cooperation between the County and the towns will be presented by witnesses.

Number five, the desire for the meaningful representation of the smaller towns within the County legislature.

And six the desire to effectuate a system of checks and balances with a legislature strong and effective enough to be able to play its proper role, vis-a-vis the county executive.

Before examining these six proffered justifications individually, it must be noted that only a few of them are referred to either in the original legislative findings incorporated in the resolution promulgating the Rockland County Plan or, so far as the record here discloses, in subsequent resolutions of the County Legislature relating to that Plan. Rather, they represent, for the most part, supposed justifications for deviation that the defendants concededly culled from other apportionment cases and sought to present here as part of their defense. Indeed, at various times during the pre-trial proceedings in this case, defendants advanced as few as four and as many as nineteen supposed justifications for the County's malapportionment. Compare Def. Mem., op. cit., at 11–14 with Joint Pretrial Order at 5–7. While defendants ultimately fixed on the six justifications advanced at trial as quoted above (see also the document entitled "Defendants' Trial Summation" at ii), few of them appear to reflect conscious policy determinations made by the County in determining how to respond to apportionment issues, but rather partake more of after-the-fact attempts at rationalization.

In any event, it remains unclear precisely what policy the County seeks to advance through its first purported justification of "historical considerations." As already discussed, the century-old policy of "two-hat" interlocking town and county representation that the Supreme Court found so significant in Abate has since been expressly repudiated by the Rockland County Legislature. To the extent that the County relies on a more amorphous "traditional" policy of "close cooperation" between the town and county governments, the Supreme Court in Abate, as previously noted, expressly rejected this as a sufficient justification for even the more modest malapportionment present in the original Rockland County Plan—noting, inter alia, that in a small county like Rockland such close cooperation was inevitable regardless of what apportionment plan was adopted. See Abate, 403 U.S. at 186, 91 S.Ct. at 1907.

Furthermore, the Court finds unpersuasive the (rather limited) proof that defendants offered at trial purporting to evidence how the Rockland County Plan especially furthers this alleged town-county cooperation. Quite apart from the fuzzy, anecdotal, hearsay-ridden, and conclusory nature of most of this evidence,[16] it proves on analysis to be of little weight or significance.

For example, defendants devoted a large part of the testimony of two of their five witnesses, Maroney and Schoenberger, to a description of the County's E911 emergency telephone system, which provides for the

---

**16.** In fairness, these deficiencies characterized much of the testimony offered by witnesses for both sides on most issues, and very few objections were interposed. Still, the Court cannot accept on faith supposed justifications for substantial malapportionment that are supported neither by legislative findings (assuming arguendo that a malapportioned legislature's findings are entitled to weight in this area) nor by reasonably "hard," reliable evidence.

County to pay for the telephone lines while town-personnel respond to the calls. *See, e.g.,* Tr. 210–15, 293–310. Upon careful review and scrutiny of that testimony, however, this Court now finds itself entirely unpersuaded that these witnesses credibly established that this allocation of executive responsibilities emanated from the particular way the Legislature was apportioned, *see* Tr. 215, or that it was, in any case, of any material practical consequence. Indeed, plaintiffs submitted convincing evidence that the E911 system in place in neighboring Westchester County, where the legislature is apportioned in single-member districts that are non-contiguous with town lines, functions no differently from the Rockland County system in any respect that a reasonable user of the system would regard as material. *See, e.g.,* Tr. 332–33 and Plaintiffs' Post–Trial Memorandum, Ex. B.

In similar fashion, while another of defendants' witnesses, Phillips, testified at length about joint county-town supervision and involvement in the County's new solid waste disposal program, Tr. 245–88, he was unable to meaningfully explain how this inevitable coordination would have been materially different if a different apportionment plan were in place. Furthermore, plaintiffs offered testimony, which the Court credits, showing that the vaunted town-county coordination in the solid waste program was simply window-dressing and led to no enhanced attention to local community needs and requirements. Tr. 338–45.

While defendants also attempted to prove a few other examples of town-county coordination, none was shown by competent and credible evidence to be either material or the result of the Rockland County method of apportionment. *See, e.g.,* Tr. 207–08, 254–55. Indeed, plaintiffs adduced convincing evidence that town-specific concerns are largely irrelevant to most of what the County Legislature concerns itself with, Tr. 46, 102, and that the chief effect of the peculiarities of the Rockland County Plan is not to enhance town-county coordination but rather to give towns enhanced capabilities to veto county-wide initiatives or stalemate County Legisla-

ture proceedings. *See, e.g.,* Tr. 50–51, 54, 90–91, 167–68, 170–74, 254, 304, 341.

To be sure, defendants maintained that the alleged delay and stalemates were simply "full debates," *see, e.g.,* Tr. 132. But the difficulty of distinguishing between legitimate "coordination" and malapportioned-enhanced "stalemating" simply demonstrates the Supreme Court's wisdom in not permitting anything as vague as "coordination" to serve as a sufficient justification for something as clear-cut and directly-injurious as a diminution in a citizen's voting power. *See Abate,* 403 U.S. at 186, 91 S.Ct. at 1907. Furthermore, even if one were to fully credit the County's self-serving view of the "close coordination" allegedly fostered by the Rockland County Plan, one still need not sacrifice voter equality to achieve this goal, for, as discussed below, the County itself has expressly conceded that substitution of a town-districted but weighted-voting system similar to that approved in *Roxbury* would result in the same degree of town-county coordination as the current Plan without resulting in anything like the same degree of malapportionment. *See, e.g.,* Defendants' Trial Summation at 21.

As the final aspect of their "historical considerations" justification, defendants offered some evidence that the Rockland County Plan helped to preserve "traditional boundaries and local allegiances," which, they argued, have independent value in their own right. While doubtless there are situations where preserving the integrity of traditional town and district boundaries, and the allegiances sometimes associated therewith, can constitute rational and material objectives warranting some deviation from strict voter equality, *see, e.g., Voinovich,* 507 U.S. at 161, 113 S.Ct. at 1159; *Mahan,* 410 U.S. at 325, 93 S.Ct. at 985, this is not such a case. Among much else, plaintiffs presented substantial evidence, which the Court credits, that Rockland County's town boundaries, drawn in many cases without regard to natural geophysical features and in some instances even dividing pre-existing villages between two towns, possess an artificiality that fails to correspond to the citizenry's perceived needs and interests. *See, e.g.,* Tr. 38–

39, 73–79, 90, 163–64, 182. To the extent, moreover, that notions of allegiance bear on this issue, plaintiffs' evidence, which the Court credits, shows that the residents of Rockland County, to the extent that they think in these terms at all, give their local allegiance first to their school and next to their village, and only finally to their town. Tr. 39–41. As former County Legislature chairman Levine testified, "I don't think there are many people who think of themselves, well, I'm a Ramapoian or an Orangetownian, or something like that. I think that's very rare." (Tr. 41). As noted earlier, moreover, school district lines do not necessarily correspond to town boundaries and village lines sometimes cross over town lines. Tr. 74, 90.

Overall, as shown clearly by the testimony at the trial of this case, Rockland County is a very different county today from the placid rural county the Supreme Court seemingly posited when it decided *Abate* more than a quarter-century ago. Joined by the Tappan Zee Bridge to the New York megapolis, the County was transformed in the 1970's and 1980's into a suburban locale, with economic, racial, ethnic, and other newly-salient interests cutting across town boundaries and with a substantial influx of new residents largely indifferent to what defendants like to call the "sanctity" of town boundaries. *See, e.g.,* Tr. 39–40, 47–48, 67–70, 178, 282. An entirely new chapter is being written in the history of Rockland County that must meaningfully inform any fair assessment of whether or not equality among its voters should remain substantially skewed by the interests and burdens of the past.

The second "justification" offered by the County—compactness and contiguity of the legislative districts—deserves but short shrift. Rockland County as a whole is already the smallest and most compact of New York's counties outside the City of New York; but if, for example, its 21 legislative members were elected from single-member districts rather than from multi-member town-districts, the districts would almost certainly be more compact than they are now. Tr. 78. Indeed, plaintiffs adduced considerable evidence that, because of the historical artificiality of the town lines, the current plan lumps together in single town-districts areas that from every other standpoint—geography, resources, schools, demographics, etc.—have nothing in common. *See, e.g.,* Tr. 39–40, 73. While, of course, redistricting always bears some risk of gerrymandering, current law requires that the new districts be reasonably compact and contiguous, *see, e. g., Shaw v. Reno,* 509 U.S. 630, 636, 113 S.Ct. 2816, 2821, 125 L.Ed.2d 511 (1993); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, § 78 (1964). Finally, if the County were to choose a weighted-voting approach to reapportionment (thereby maintaining town-districts but greatly decreasing malapportionment), even slight gerrymandering could be avoided.

The County's third purported "justification"—the desire to maintain the integrity of political subdivisions within the County legislature—is simply a rehash of arguments advanced by defendants, and rejected by the Court, in connection with the prior justifications discussed above. *See* Defendants' Trial Summation at 13–15 (repeating under this heading arguments advanced earlier under the prior two headings).

The County's fourth purported "justification"—"the desire to have a small enough county legislature to allow for effective performance in close cooperation with the towns on county-wide programs" (Tr. 24)—is possibly the least convincing of all defendants' claims. If, as the quoted language implies, it is a smallness in the size of the legislature (rather than the peculiarities of multi-member town-districting) that promotes "effective performance" and "close cooperation with the towns," then it is the Rockland County Plan that, more than any other, stands in the way of fully realizing these goals. For whereas there is nothing in either a single-member redistricting plan or a town-boundary weighted-voting plan that would prevent the Rockland County Legislature from remaining small or, indeed, becoming even smaller, *see* Tr. 97, as previously explained in this Opinion it is a peculiarity of the Rockland County Plan that it, alone among apportionment plans, places the County in the awkward position (as in 1980 and again in 1990)

of having to choose between increasing the size of the Legislature and increasing the deviation from voter equality. Tr. 99. It is remarkable that, having candidly conceded this fundamental flaw in the Plan during the pretrial proceedings in this case, defendants should try, as they then did at trial, to portray it as a virtue; but such sophistry once again casts doubt on the genuineness of the "legislative policies" now advanced (without any support in the legislative pronouncements themselves) as purported justifications for the Rockland County Plan.

By contrast, the fifth purported "justification"—the desire for the meaningful representation of the smaller towns within the County Legislature—is one of the few policies that the County Legislature actually adverted to in its 1993 resolution declining to reapportion itself after the 1990 census Whitman Aff., Ex. E. Several factors, however, diminish the importance of this legislative declaration. First, the resolution was passed well before the abolition of the "two-hat" rule was due to take effect, in other words, at a time when the interlocking nature of the town and county governments was still a central feature of the Plan. In arranging for the subsequent abolition of the "two-hat" approach, the County Legislature implicitly disavowed a primary basis for the "town voice" policy. Tr. 104. Second, at the time of the declaration, the Rockland County Legislature was operating on the assumption, borne of prior state court decisions, that a weighted-voting alternative was impermissible. *English v. Lefever*, Ind. Nos. 3143/1981, 3933/1981, May 24, 1982, June 22, 1983 and June 7, 1984. *Roxbury*, however, establishes otherwise. With this alternative before them, the Legislature might well have concluded that the interest in giving small towns their individual say could still be realized, but more commensurately with voter equality, by maintaining town-district boundaries but weighting the members' votes. Third, and most fundamentally, unless kept within tight bounds an apportionment plan that consciously and as a matter of policy accords greater weight to the voters of smaller towns than to those elsewhere situated is on its face discriminatory and violative of equal protec-

tion under the Fourteenth Amendment. It cannot, under any analysis, be sufficient in itself to warrant the nearly 20% deviation from equality present in Rockland County.

The County's sixth (and final) purported "justification"—a desire to effectuate a system of checks and balances with a legislature strong and effective enough to be able to play its proper role vis-a-vis the county executive—has not been shown to have been even remotely before the County Legislature at any time that it considered the Rockland County Plan. So far as the record reveals, it appears simply to be a post-hoc rationalization, based on analogies to other cases. In any event, the analogy is flawed, for there is no credible testimony anywhere in this record indicating that the strength of the County Legislature in comparison to the County Executive is in any manner dependent on the plan of apportionment. To the contrary, plaintiffs presented evidence that the County Legislature is weakened by the present system, which obliges the Legislature to meet infrequently so that its members can attend to their more pressing town-related duties. Tr. 104, 118–19. A County Legislature whose only agenda was to attend to county business would inevitably be stronger in dealing with the County Executive than one whose obligations were diffuse and loyalties divided.

### Conclusions And Remedies

The Court concludes that plaintiffs have established both that the Rockland County Legislature is significantly more malapportioned than at the time of *Abate*—specifically, 19.8% malapportioned by the appropriate mathematical calculation—and, conversely, that the justifications on which the Supreme Court relied in approving the original Rockland County Plan have substantially diminished. Further, the Court concludes that, even assuming that any combination of additional justifications could support such an inherently flawed Plan as this one, defendants have not, through competent, convincing, or credible evidence, made out a case for any such justifications. Indeed, even assuming *arguendo* that it was the plaintiffs' burden to refute such proffered justifications, they have done so.

The remaining question then is, what is the appropriate remedy? Plaintiffs have submitted a proposed redistricting plan, *see* Tr. 165, but the Court agrees with defendants that the proper path at this juncture is to give the County Legislature a brief opportunity—not to exceed 90 days (the period requested by County counsel, *see* Tr. 355)—to submit to the Court, if it so desires, one or more proposed plans for reapportionment.

Without necessarily limiting the options, the Court can foresee two kinds of plans that might meet with its approval. One, obviously, is a simple redistricting plan that lowers deviation below the 10% threshold as measured by the traditional formula. This, as previously mentioned, is the solution favored by a majority of the counties in the State of New York, all of which appear to function nicely despite the necessity of redrawing their district boundaries every decade or so. *See* Tr. 346–48.

A second, and possibly more problematic option is a weighted-voting plan that retains the current town-districts. While *Roxbury* approved a weighted-voting system in Delaware County, and there are several other New York State counties that operate under such plans,[17] there are certain intuitively-obvious problems with such a system that may not make it appropriate for every case. In particular, a weighted-voting plan is potentially confusing, and arguably discriminatory, to voters in any lesser-weighted town-district, who are deprived of the opportunity of electing a county legislator having the same power as the legislator elected by their neighbors in some greater-weighted town-district. *See* Tr. 47–48.

On the other hand, the weighted-voting approach has the considerable virtue of commending itself to both sides to this litigation. Thus, the plaintiffs have previously represented to this Court that a weighted-voting plan would be acceptable to them, Tr.8, and the defendants not only have similarly represented, Tr. 11–12, but also have flatly affirmed that a weighted-voting system would in their view fulfill to the very same extent as the present system the six County "justifications" they advocate. Tr. 27. But it is critical for the parties, and especially the defendants, to understand that a weighted-voting system that, in these circumstances, has any chance of surviving constitutional scrutiny must be one that very substantially reduces deviation, however it may be calculated, from where it is under the present Plan.

In summary, the Court awards judgment to plaintiffs on the issue of liability and declares the Rockland County Legislature to be unconstitutionally apportioned and in need of prompt reapportionment; but the Court stays determination of the remedy and execution of the judgment to permit the County Legislature to submit to the Court by no later than August 14, 1997 one or more proposed plans for reapportionment acceptable to the Legislature and consistent with this opinion, to be promptly considered by this Court and either approved or modified as the law requires. Finally, counsel for the parties are directed to appear before this Court at 9:00 A.M. on Friday, August 15, 1997 in Courtroom 14–D at 500 Pearl Street, New York, New York, to address all remaining issues herein.

SO ORDERED.

---

**17.** By contrast, no other county has adopted anything like the Rockland County Plan. *See* Plaintiffs' Trial Ex. 2.