Michael J. CECERE, III, Christine A. Nagy, William Odol, Carolyn Delvecchio and Donald V. Pupke, Jr., Plaintiffs,

v.

THE COUNTY OF NASSAU, the Nassau County Legislature, Judith Jacobs, as Presiding Officer of the Nassau County Legislature, and Nassau County Board of Elections, John A. Degrace, in his official capacity as a Commissioner of the Nassau County Board of Elections, Eric S. Brown, in his official capacity as a Commissioner of the Nassau County Board of Elections, Defendants.

No. 03–CV–1548(DRH)(WDW).

United States District Court, E.D. New York.

July 31, 2003.

Rivkin Radler LLP, Uniondale, By Evan H. Krinick, Esq., for Plaintiffs.

Lorna B. Goodman, Nassau County Attorney, Mineola, By Jeffrey M. Wice, Esq., David B. Goldin, Esq., for Defendants.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court are (1) defendants' motion for an order dismissing the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and (2) plaintiffs' motion for reconsideration of their motion for expedited discovery.

For the reasons provided *infra*, defendants' motion is granted and plaintiffs' is denied as moot.

## BACKGROUND

### 1. Complaint

The five plaintiffs, who reside in various Nassau County legislative districts, brought suit against the County of Nassau, the County Legislature, Judith Jacobs, as presiding officer of the Legislature and against the Board of Elections and its Commissioners. The relief sought includes a declaration by this Court that the redistricting plan adopted by the Nassau County Legislature on June 27, 2003, with respect to the County's nineteen legislative districts violates the Fourteenth Amendment of the United States Constitution, as well as various provisions of state law.

The complaint contains 285 numbered paragraphs. Reduced to its essentials, plaintiffs complain that (1) the Democratic majority used its ten-to-nine advantage to enact a redistricting plan to advance its political agenda, (2) the resulting map is essentially a hodgepodge of misshapen districts in which various towns, villages and communities are unnecessarily divided and (3) that the Democratic legislators did not make a good faith effort "to reduce the total population deviation to as low a deviation as practicable." (Compl., ¶ 250.)

With respect to item 1, viz., that the redistricting plan is the product of the Democratic legislators' political agenda, the following paragraphs of the complaint are illustrative: Local Law "2-2003 was promulgated for political reasons, to wit, to strengthen Districts represented by Democratic legislators, to increase the chances of Democratic candidates to prevail in Districts currently represented by Republican Legislators, and to weaken districts presently represented by Republican Legislators where Democratic candidates had a viable chance to succeed" (*id.* ¶ 244); "[t]he design of the Democratic Legislators was to satisfy a political agenda" (*id.* ¶ 251); "[u]nder the final map, many regis-

tered Democrats were purposefully placed in the districts of Republican legislators Salvatore Portillo, Norma Gonsalves and John Ciotti so as to give Democratic candidates a better chance of winning in those districts" (*id.* ¶ 233); a Democratic appointee to the Temporary Districting Advisory Commission "conceded" that the redistricting proposal that was the basis for Local Law 2–2003 "was motivated by an effort to strengthen Democratic candidates in many districts" (*id.* ¶ 234); the chair of the Nassau County Democratic Party "acknowledged that the final map 'gives us [the Nassau County Democratic Party] a more competitive chance and minimizes the impact of the Republican machine'" (*id.* ¶ 235).

The following paragraphs of the complaint are representative of those which speak of towns, villages and communities being unnecessarily divided: "members of the public who spoke at the December 30th and 31st public hearing, overwhelming expressed the desire that the proposed map not differ significantly from the 1994 [i.e., the prior] map" (*id.* ¶ 131); "[t]he final map enacted by the Nassau County Legislature increased by 33% the number of Village lines split" (*id.* ¶ 220); [t]he final map enacted by the Nassau County Legislature increases by over 50% the number of communities split" (*id.* ¶ 221); [t]he final map enacted by the Nassau County Legislature increases by 100% the number of Town lines crossed" (*id.* ¶ 222); "[i]n order to achieve a constitutional districting plan, only five district lines would have been needed to be changed from the [1994 map]" (*id.* ¶ 230); and "[u]nder the final map, all nineteen districts were substantially re-drawn" (*id.* ¶ 231).

Finally, with respect to the allegations in the complaint alleging that defendants did not endeavor to enact a plan with the lowest deviation rate practicable, consider the following paragraphs: "[t]he Democratic Legislators did not make good faith efforts to reduce the total population deviation to as low a deviation as practicable" (*id.* ¶ 250); "[t]he objective of the Democratic Legislators was to create nineteen districts with a total population deviation of less than 10% regardless of the practicality and ease of reaching a lower percentage of deviation" (*id.* ¶ 252); "[t]he Legislature could have, with great practicality, come much closer to equal population for each district" (*id.* ¶ 255); Local Law 2–2003 "was not the result of an honest and good faith effort to construct districts as nearly equal in population as practicable" (*id.* ¶ 257); "[t]he Legislature did not make any reasonable effort to minimize the maximum total deviation" (*id.* ¶ 259).

### 2. *Position of Parties*

#### A. *Plaintiffs' Position*

Plaintiffs' sole federal claim is that the weight of their vote, as members of more populous legislative districts, has been diluted vis-a-vis their counterparts in less populated districts.[1] "Simply put, [plain-

---

**1.** Although the perceived wrong articulated by plaintiffs is said to be the result of the Democratic legislators' political agenda, plaintiffs have not invoked the principle of *unconstitutional* political gerrymandering, as defined in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), in seeking to invalidate the map. *See* Compl. and Apr. 11, 2003 Letter from Pls.' counsel, Evan H. Krinick of Rivkin Radler, at 1, n.1.

Had plaintiffs done so, as defendants seem to suggest they have [Defs.' Mem. Supp. at 9], the challenged pleading clearly would be insufficient given its failure to "plead facts adequate to prove *Davis'* two required elements: that there has been intentional discrimination against an identifiable group and an actual discriminatory effect on that group." *Duckworth v. State Administration Board of Elections*, 332 F.3d 769, 774 (4th Cir.2003).

tiffs argue] the Constitution requires a good faith effort to achieve a deviation as low as practicable, not an arbitrary, secretive process that attempts to achieve a deviation as close to 10% as possible that violates every districting principle but enhances the political power of the controlling political party." Pls.' Mem. Supp. at 26.

### B. *Defendants' Position*

■ Preliminarily it should be noted that plaintiffs acknowledge that the current map "has an estimated total deviation rate of 8.94%" (Compl., ¶ 218).[2] That brings into play the so-called 10% rule applicable to state and local elections. *Marylanders for Fair Representation v. Schaefer*, 849 F.Supp. 1022, 1030 (D.Md. 1994). If the deviation rate is less than 10%, the difference is considered to be a "minor deviation" (*Brown v. Thomson*, 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983)) and the redistricting plan is presumptively valid. *Marylanders for Fair Representation*, 849 F.Supp. at 1031. Conversely, a plan with a deviation of more than 10% "creates a prima facie case of discrimination and therefore must be justified by the state." *Brown v. Thomson*, 462 U.S. at 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983).

■ Having discussed the 10% rule, attention will now be directed to defendants' argument in support of their motion to dismiss the complaint under Rule 12(b)(6). In essence, defendants' argument is that plaintiffs, given that the maximum deviation rate is less than 10%, must plead facts which, if ultimately established, would indicate that the "minor" deviation in the redistricting plan is a result of the promotion

of an unconstitutional or irrational state policy.

The gravamen of the complaint is that · the map was drawn to favor Democrats, resulting in the unnecessary division of town, villages and communities. In defendants' view, that conduct simply is not violative of the equal protection clause of the Fourteenth Amendment, i.e., it may not be equated with the promotion of an unconstitutional or irrational state policy.

### 3. *Standard for Determining Rule 12(b)(6) Motion*

On a motion to dismiss made pursuant to Rule 12(b)(6), the Court may dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citation omitted). When considering a Rule 12(b)(6) motion, a court must accept the truth of, and draw all reasonable inferences from, the well-pleaded factual allegations contained in the complaint. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998)(internal quotations omitted). Therefore, the Court only considers the allegations of the complaint,[3] drawing all inferences in the plaintiffs' favor. *Id.*

### DISCUSSION

### 1. *Preliminary Observations:*

### A. *Significance of Deviation Rate*

Given that the deviation rate is under 10%, the plan is presumptively constitu-

---

**2.** The "1994 [map] had a 9.3% total deviation from population equality." Compl., ¶ 212.

**3.** For Rule 12(b)(6) purposes, the complaint includes exhibits referenced therein.

tional. For plaintiffs to rebut that presumption, plaintiffs must prove that the deviation, albeit small, is nonetheless constitutionally unacceptable. *See Abate v. Rockland County Legislature,* 964 F.Supp. 817, 819 (S.D.N.Y.1997)("Where a state or local apportionment plan deviates from equality by less than 10%, it is presumptively constitutional, and a challenger has the burden of proving that even such a 'minor deviation' is the result of discriminatory state action"); *Marylanders for Fair Representation,* 849 F.Supp. at 1032 ("[A]lthough there is some language in several decisions indicating that plans with less than a ten percent deviation are essentially per se constitutional, none of those decisions expressly so states, and it appears that the plaintiffs in those cases did not raise any arguments that the minor deviation was the result of an unconstitutional or irrational purpose.").

**B.** *Reynolds v. Sims Must be Read in Conjunction With Such Cases as Brown v. Thomson and Gaffney v. Cummings*

In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court held that the:

"Equal Protection Clause requires that a State make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable."

*Id.* at 577, 84 S.Ct. 1362. That excerpt, applied literally, might suggest that any plan, even those with a deviation of under 10%, would be subject to a successful attack if the person claiming to be aggrieved could proffer a feasible alternate plan producing greater population equality among districts. Although population equality to the extent practicable may be the goal, "an individual's right to vote for state legislators [as distinct from congressional representatives] is [not] unconstitutionally impaired [unless] its weight is in a *substantial* fashion diluted when compared with votes of citizens living in other parts of the State." *Reynolds v. Sims,* 377 U.S. at 568, 84 S.Ct. 1362 (emphasis added). Moreover, as explained by Justice Brennan in his dissent in *Brown v. Thomson,* almost twenty years after *Reynolds v. Sims,* "[o]ur cases since *Reynolds* have clarified the structure of the constitutional inquiry into state legislature apportionments setting up what amounts to a four-step test," with the first step being a determination of whether the deviation is above or below 10%. 462 U.S. at 852, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (Brennan, J. in dissent). A deviation rate under 10% "will ordinary be considered de minimis." *Id.* And *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (which involved deviation rates under 10%) instructs that judicial involvement in the inherently political and legislative process of apportionment "must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard. The point is, that such involvements should never begin." 412 U.S. at 750–51, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

In sum, a plaintiff's burden, both as to pleading and ultimate proof, is formidable when, like here, a pure "one vote, one person" claim is advanced, devoid of any racial or other protected status claim, or of a *Davis v. Bandemer* political gerrymandering cause of action.

The question is whether the complaint, construed most favorably to the nonmovants, sets forth facts which, if established, would prove that one or more plaintiffs will be deprived of his or her right to equal protection under the Fourteenth Amend-

ment should Local Law 2–2003 be permitted to stand.

■ As noted, the complaint speaks of the current map being the product of rank partisanship by the Democratic majority with a resulting inordinate division of towns, villages and communities. But, for the reasons to be provided, *infra*, such conduct, although perhaps a violation of state law, is not violative of the Fourteenth Amendment.

2. *Even if Local Law 2–2003 was Promulgated for Political Reasons (i.e., to Benefit Democratic Candidates and Disadvantage Republican Candidates), as Plaintiffs Allege, That Alone is not Violative of the Fourteenth Amendment*

*Gaffney v. Cummings* involved a reapportionment plan for the Connecticut General Assembly and Senate Districts. "The maximum deviation [under the challenged plan] between any two [General Assembly] districts [was] 7.83%." 412 U.S. at 737, 93 S.Ct. 2321. The corresponding rate for the Senate was 1.81%. *Id.*

In Connecticut, towns, not counties, are the basic unit of local government. The Democratic and Republican Party leaders in the State Legislature appointed an equal number of members to a bipartisan Apportionment Board. The Board, using "party voting results in the preceding three statewide elections ... created what was thought to be a proportionate number of Republican and Democratic legislative seats." *Id.* at 738, 93 S.Ct. 2321. In the process, "the Board cut the boundary lines of 47 of the State's 169 towns" (*id.*), with some town lines "cut more than once." *Id.*, n. 3, 93 S.Ct. 2321.

Shortly after the Board filed its reapportionment plan, an action was brought in federal district court seeking declaratory and injunctive relief. Among the claims advanced were that "an excessive number of towns [were divided] in forming assembly district[s]" due to the Board endeavoring to achieve a "*smaller* deviation from population equality than required by the Fourteenth Amendment." *Id.* at 739, 93 S.Ct. 2321 (emphasis added). Additionally, it was alleged that the plan "contained 'a built-in bias in favor of the Republican Party.'" *Id.*

The three judge district court which decided the case found for plaintiffs,[4] concluding that "'the deviation from equality of population of the Senate and House districts [was] not justified by any sufficient state interest and that the Plan denie[d] equal protection of the law in the districts of greater population ....' ....

---

4. The Court notes that it may be confusing that certain of the cited cases involving challenges to redistricting plans required a three-judge panel and others, such as the instant case, did not. The applicable statute, 28 U.S.C. § 2284(a), states that "[a] district court of three judges shall be convened when ... an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any *statewide* legislative body." *Id.* (emphasis added). Under this statute, the Supreme Court has identified four elements that, if present, necessitate convening a three-judge district court: (1) a claim for injunctive relief (2) against a state officer, (3) to prevent enforcement of a statewide statute (4) which is challenged as being unconstitutional in substantial ways. *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 94, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974); *see also Brown v. Liberty Loan Corp. of Duval*, 539 F.2d 1355, 1359 n. 2 (5th Cir. 1976). "If any one of those criteria is missing, a three-judge district court is not necessary." *Young v. Walker*, 435 F.Supp. 1089, 1093 (M.D.Fla.1977). Specifically, if, as in the instant case, the challenged statute does not have statewide effect, a three-judge panel is not required. *Board of Regents of Univ. of Tex. System v. New Left Educ. Project*, 404 U.S. 541, 545, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

More particularly, the court found that the 'partisan political structuring ... cannot be approved as a legitimate reason for violating the requirement of numerical equality of population in districting.'" *Id.* at 739–40, 93 S.Ct. 2321.

In reversing, the Supreme Court explained:

> We think that appellees' showing of numerical deviations from population equality among the Senate and House districts in this case failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment, whether those deviations are considered alone or in combination with the additional fact that another plan could be conceived with lower deviations among the State's legislative districts. Put another way, the allegations and proof of population deviations among the districts fail in size and quality to amount to an invidious discrimination under the Fourteenth Amendment which would entitle appellees to relief, absent some countervailing showing by the State.

*Id.* at 740–41, 93 S.Ct. 2321.

The rationale for its holding that plaintiff-appellees had failed to, inter alia, make out a prima facie violation of the Fourteenth Amendment is found in the following excerpts from the opinion:

> The very essence of districting is to produce a different—a more "politically fair"—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census

map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.

412 U.S. at 753, 93 S.Ct. 2321. In that context, the Court said:

> [T]he goal of fair and effective representation [is not] furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan. .
>
> .    .    .    .    .
>
> The point is, that such involvements should never begin. We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it. Their work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved.

*Id.* at 749–751, 93 S.Ct. 2321.

There are obvious distinctions between *Gaffney* and the case at bar. In *Gaffney,*

notwithstanding appellees' allegations that the plan had a built-in bias in favor of Republicans, it seems that the drafters of the plan tried to perpetrate the then current percentages of Democrats and Republicans in the State Legislature rather than, as here, to allegedly enhance the Democrats' position at the expense of Republicans. Additionally, the primary focus of the challenge in *Gaffney* was upon the allegedly unnecessary division of so many towns. That argument was based on the anomalous proposition that the Board went too far in endeavoring to promote equality, i.e., the deviation rate was unnecessarily low. Nonetheless, *Gaffney* is instructive for present purposes in that it (1) underscores that redistricting is essentially a political and legislative process and (2) found that a maximum deviation rate of 7.83% in a non-congressional redistricting case was insufficient, as a matter of law, to establish a prima facie violation of the Fourteenth Amendment in the context of a pure "one person, one vote" challenge.

Indeed, the Supreme Court has recognized political motivation as a possible *defense* against a claim of racial gerrymandering. In *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999), North Carolina residents brought action against various state officials challenging the state's redistricting plan as racially motivated in violation of the Fourteenth Amendment. A three judge district court granted summary judgment and injunctive relief to plaintiffs. The Supreme Court, in reversing that determination stated:

> Accepting appellants' political motivation explanation as true, as the District Court was required to do in ruling on appellees' motion for summary judgment ... appellees were not entitled to judgment as a matter of law. Our prior decisions have made clear that a jurisdiction may engage in *constitutional* po-

litical gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact ... Evidence that blacks constitute even a supermajority in one congressional district while amounting to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference.

*Id.* at 552, 119 S.Ct. 1545 (emphasis added to *"constitutional"*).

As defendants correctly note, *Hunt* instructs that it is not just that "political motivation in redistricting is not impermissible—[but] more important[ly] ... that political motivation is the essence of a *permissible* policy." Defs.' Mem. Supp. at 13. *See also Duckworth v. State Administration Board of Elections Laws*, 332 F.3d 769, 774 (4th Cir.2003)("[W]hen a plaintiff fails to proffer sufficient evidence to satisfy *Davis'* elements [or here, to even suggest political gerrymandering under *Davis* ], the resulting conclusion is not that no political gerrymandering exists, but that any gerrymandering that did occur was constitutional.").

In sum, the alleged political motivation alleged in the complaint does not, standing alone, implicate the equal protection clause of the Fourteenth Amendment.

But, of course plaintiffs have alleged more. Not only does the complaint charge defendants with passing Local Law 2–2003 for the purpose of promoting the Democratic agenda but it is also replete with paragraphs, many quoted earlier, charging that towns, villages and communities were unnecessarily divided and that defendants did not endeavor to enact a plan with the lowest deviation rate practicable.

It is evident from a reading of the complaint that plaintiffs' three federal claims regarding (1) defendants' political agenda, (2) the unnecessary division of towns, villages and communities, and (3) the absence of a good faith effort to construct districts as nearly equal in population as practicable, are intertwined. Accordingly, much of what has been said thus far pertains to all three issues. Nonetheless, given the importance of the subject matter and that it is atypical to dismiss a voting rights claim prior to discovery (*cf. Rodriguez v. Pataki*, 02–CV–618, 2002 WL 1058054 (S.D.N.Y. June 24, 2003)), the Court will address the geographical division and lack of good faith issues separately, endeavoring to avoid unnecessary repetition.

3. *Divisions of Towns, Villages, and Communities, as Alleged by Plaintiffs, is not Sufficient to Invalidate the Redistricting Plan Under the Fourteenth Amendment*

Plaintiffs cite the purportedly inordinate division of towns, villages and communities as evidence of defendants' "bad faith" in enacting Local Law 2–2003. A similar argument was voiced by the unsuccessful appellant in *Duckworth*. Duckworth maintained that "the bizarre appearance of the districts, and their alleged lack of continuity, are proof of the states's districting manipulations, of the assured electoral victory of Democratic candidates, and of the illegal repression of his political voice." *Duckworth*, 332 F.3d at 769.

In rejecting that claim—and affirming the district court's Rule 12(b)(6) dismissal of his complaint—the Fourth Circuit explained:

> At most it may be fairly inferred from bizarreness that the political apportionment was a result of intentional political action and resulted in political affect. But, of course, *political affect itself is an expected and indeed intended, result of apportionment.* ... That bizarreness may establish political affect is therefore an unobjectable, and in fact expected conclusion."

*Id.* at 775, citing *Gaffney v. Cummings* (emphasis in original).

*Gaffney* is also instructive for present purposes. As earlier discussed, a major component of Gaffney's challenge to the redistricting plan was that its implementation caused the " 'segmentation of an excessive number of towns in assembly district[s].' " *Gaffney*, 412 U.S. at 739, 93 S.Ct. 2321. Yet the Supreme Court was not required to, and did not substantively address the segmentation issue given its conclusion that Gaffney's "showing of numerical deviations from population equality among the Senate and House districts ... failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 740–41, 93 S.Ct. 2321.

■ In sum, the division of towns, villages and communities is evidence of political motivation being the driving force behind Local Law 2–2003. There are no factual allegations in the complaint to suggest that it is anything more. Therefore, as a matter of law, as in *Duckworth* and *Gaffney*, those allegations, are of no federal constitutional significance under the present pleading.

With respect to the complaint's repeated reference to "bad faith," such cases as *Abate v. Rockland County Legislature*, and *Marylanders for Fair Representation* make clear that, for an apportionment plan with a deviation rate under 10% to be subject to a Fourteenth Amendment constitutional challenge, the challenger must plead, and ultimately prove that the minor deviation is the result of, in the language of *Abate* "discriminatory state action," (964

F.Supp. at 819) or, as phrased in *Marylanders for Fair Representation* "the result of an unconstitutional or irrational purpose" (849 F.Supp. at 1032). However, a reading of the instant complaint indicates that the challenged geographical divisions are the by-product of the political motivation which allegedly shaped the plan embodied in Local Law 2–2003. Given that political motivation of the type alleged here is, as discussed *supra*, common in the redistricting process and is not unconstitutional, the concomitant by-product may not be legitimately labeled—again construing everything most favorably to plaintiffs—as unconstitutional, irrational or the result of discriminatory state action.

4. *The Additional Allegations of Bad Faith in the Complaint Beyond Those Pertaining to the Division of Towns, Villages and Communities are Insufficient to Render the Complaint Viable*

There are numerous allegations in the complaint along the lines of Local Law 2–2003 entailing "a total population deviation rate greater than necessary" and the plan being "the product of bad faith not intended to further any legitimate governmental interest." Pls.' Reply Mem. at 13. However, it is axiomatic that such conclusory allegations as "bad faith" are insufficient to defeat a properly grounded Rule 12(b)(6) motion. *Duckworth*, 332 F.3d at 778. For plaintiffs' bad faith allegation to have legal significance, therefore, they must be read in conjunction with the complaint, drawing all reasonable inferences in favor of plaintiffs. With that preliminary observation having been made, the Court will focus on the substance of plaintiffs' additional bad faith claim.

As understood by the Court, the proposition is that Local Law 2–2003 is unconstitutional unless the differential, if any, between its deviation rate of 8.94% and the lowest rate practicable is proven to be necessary to advance a legitimate state interest. From that, plaintiffs maintain that "[f]actually, until defendants initially plead and ultimately prove that ... the extreme population deviation is necessary to satisfy a rational state policy [i.e., the product of "good faith"], plaintiffs' pleading more than states a claim." Pls.' Reply Mem. at 10.

Plaintiffs placing of the burden of proof on defendants is incorrect given that the deviation rate is under 10%. But that really is not the central question for present purposes. Instead, the issue is whether Local Law 2–2003 must be invalidated unless the claimed differential is attributable to such state interests as contiguousness, preserving municipal boundaries or creating compact districts. Which is to say, if the proof ultimately establishes that the defendants failed to harmonize such considerations with their political agenda in drafting the challenged map, does that cause the map to run afoul of the Fourteenth Amendment? The question does not lend itself to a simple response.

Plaintiffs are correct in stating that "[n]umerous federal courts have recognized that certain traditional New York districting criteria ... may be considered [in evaluating] a districting plan." Pls.' Mem. Supp. Motion for Recons. at 21. It does not follow, however, that such considerations are germane for present purposes.

The Supreme Court has not explicitly addressed the question, as explained in the following excerpt from *Duckworth:*

[M]ight a plaintiff be able to offer probative evidence of discriminatory political effect in a political gerrymandering case by way of a non-contiguity complaint. The Supreme Court has said that contiguousness represents one of the principles of apportionment, along

with compactness and respect for political subdivisions. *See Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). But the Court has also said that "these criteria are important not because they are constitutionally required—*they are not,* but because they are objective factors that may serve to *defeat* a claim that a district has been gerrymandered[.]" *Id.* at 647, 113 S.Ct. 2816 (emphasis added). Thus, the Court, though noting that these factors—as *principles* of apportionment—represent valid state interests in apportionment, has never said that *lack* of such factors could be probative of discriminatory political effect.

332 F.3d at 778.

However, the answer to this pivotal question is implicit in the holding in *Gaffney.* As noted earlier, the district court had declared Connecticut's reapportionment plan unconstitutional because the deviation rate, although under 10%, was "not justified by any sufficient state interest." *Gaffney,* 412 U.S. at 740, 93 S.Ct. 2321. Yet the Supreme Court found it unnecessary to even address the "state interest" argument in reversing the lower court given the low deviation rate and concomitant failure by plaintiff-appellees to establish a prima facie case.

■ If, as plaintiffs urge, state interest factors are relevant, not only if invoked by a state to justify a deviation rate over 10%, but also as affirmative evidence of "bad faith" sufficient to invalidate a pure "one person, one vote" claim, the 10% rule would be rendered virtually meaningless. It would mean that any plan with *a* deviation rate would be subject to attack. That the challenger bears the burden of proof when the deviation rate is under 10% is largely irrelevant to the concern expressed in *Gaffney* that federal courts not be drawn into the political and legislative redistricting thicket in scenarios involving "minor deviations from mathematical equality among state legislative districts." *Gaffney,* 412 U.S. at 745, 93 S.Ct. 2321. "It makes little sense to conclude [that such] variations among legislative districts [causes] any person's vote [to be] *substantially* diluted." *Id.* at 745–56, 93 S.Ct. 2321 (emphasis added). *Gaffney* tells us that a rate of 7.83% is a "minor deviation." There is no reason to conclude that the instant rate of 8.94% should not be similarly categorized. *See Fund for Accurate and Informed Representation, Inc., v. Weprin,* 796 F.Supp. 662, 668 (N.D.N.Y. 1992), aff'd Mem., 506 U.S. 1017, 113 S.Ct. 650, 121 L.Ed.2d 577 (1993)("absent credible evidence that the maximum deviation exceeded 10 percent [it was 9.43%], plaintiffs failed to establish a prima facie case of discrimination ... sufficient to warrant further analysis by this court.") [5]

5. In this Court's April 23, 2003 decision denying plaintiffs' motion for expedited discovery, I found that a deviation rate of under 10% did not render a pure "one person, one vote" controversy nonjusticiable. Apr. 23, 2003 Mem. In doing so, I disagreed with the holding in *Fund for Accurate and Informed Representation, Inc. v. Weprin,* 796 F.Supp. 662 (N.D.N.Y.1992), aff'd Mem. 506 U.S. 1017, 113 S.Ct. 650, 121 L.Ed.2d 577 (1993) insofar as that court concluded to the contrary. *Id.* at 9–10.

Had the present plaintiffs alleged facts which, if ultimately established, would have demonstrated that the deviation rate differential between 8.94% and what it could have been, was attributable to "discriminatory state action" (*Abate v. Rockland County Legislature,* 964 F.Supp. 817, 819 (S.D.N.Y.1997)) or "the result of an unconstitutional or irrational purpose" (*Marylanders for Fair Representation v. Schaefer,* 849 F.Supp. 1022, 1032 (D.Md.1994)), then defendants' Rule 12(b)(6) would be denied. Those circumstances would create a justiciable controversy. Instead, however, a fair reading of the complaint, drawing all inferences in favor of plaintiffs, paints a different, and one dimen-

In urging a contrary result, plaintiffs place considerable stock in *Hulme v. Madison County*. In *Hulme*, the challenged "apportionment plan was the creation of one Board member [of the twenty nine person Board], Wayne Bridgewater, the Chair of the assigned [five member] Committee, influenced by another Board member." 188 F.Supp.2d at 1044. Mr. Bridgewater accomplished his goal via insults, threatening and bullying other Board members. *Id.* Under the circumstances, it is readily understandable that the court concluded that the apportionment plan passed by the Board was unconstitutionally affected by "arbitrariness or discrimination" even though the deviation rate was under 10%. Here, however, Local Law 2–2003 is not alleged to be the work product of one person but rather of the Democratic majority of the Nassau County Legislature, and political motivation is recognized as constitutionally permissible in a redistricting context. Nor is the law claimed to be the product of threats or other forms of intimidation. Yes, there are allegations in the complaint that defendants were rude to Republican legislators and gave short shrift, if any consideration to their proposals. As lamentable as that conduct may be, it does not implicate the Fourteenth Amendment.

## CONCLUSION

A fair reading of the complaint indicates that the driving force behind defendants' actions was to advance their political agenda as alleged by plaintiffs. As a result, the maximum deviation rate was not as low as it otherwise arguably could have been and a number of towns, villages and communities were divided. However, as noted, those circumstances, viewed singularly or cumulatively, given the limited nature of

plaintiffs' challenge, do not, as a matter of law, run afoul of the equal protection clause of the Fourteenth Amendment. If plaintiffs established each and every allegation in their complaint, independent of those that are purely conclusory, their proof would fall short of establishing a federal constitutional violation. The Court notes that plaintiffs may well have articulated viable state-based constitutional and statutory causes of action (*see generally Rodriguez v. Pataki*, 2002 WL 1058054, *4 (S.D.N.Y.)) but declines to entertain those claims in the absence of a federal constitutional claim. Under the circumstances, defendants are entitled to judgment as a matter of law under Rule 12(b)(6). The dismissal of the complaint, however, is without prejudice. Should plaintiffs elect to file an amended complaint, such filing shall be done within thirty days of the docketing of this decision; otherwise the complaint will be dismissed and the case closed.

**SO ORDERED.**

---

sional picture, viz., one of a redistricting map shaped by the political agenda of the Demo-

cratic majority within the Nassau County Legislature.