Sara LARIOS, et al., Plaintiffs,

v.

Cathy COX, in her official capacities as Secretary of State of Georgia and Chair of the State Election Board, Defendant.

No. CIV.A. 1:03–CV–693–C.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 20, 2004.

Frank B. Strickland, Anne Ware Lewis, Strickland, Brockington, Lewis, Stacy Grant Freeman, Arnall, Golden & Gregory, Atlanta, GA, E. M. Braden, phv, Amy M. Henson, phv, Baker & Hostetler, Washington, DC, for plaintiffs.

Dennis Robert Dunn, Thurbert E. Baker, Office of State Attorney General, Mark Howard Cohen, Troutman Sanders, David F. Walbert, Parks Chesin & Walbert, Atlanta, GA, for defendants.

**1336**

Before MARCUS, Circuit Judge, PANNELL and O'KELLEY, District Judges.

PER CURIAM.

The captioned case comes before the court for consideration of the defendant's motion for a stay [172–1] pending appeal to the United States Supreme Court pursuant to 28 U.S.C. § 1253. On February 10, 2004, we found that Georgia's 2001 House of Representatives and 2002 Senate redistricting plans violate the one person, one vote principle of the Equal Protection Clause of the Fourteenth Amendment. We gave the state until March 1, 2004, to present plans, adopted by the Georgia General Assembly and signed by the Governor, for the court's consideration. We further indicated that if the state is unable to present plans consistent with this court's orders, or if the Attorney General indicates that Section 5 preclearance procedures will not be completed in time for candidate qualifying, then the plaintiffs may petition this court to draw *interim* plans to be used until the State of Georgia can craft reapportionment schemes consistent with the Constitution. The parties presented oral argument regarding the stay request on February 19, 2004.

## A. Analysis

Federal Rule of Civil Procedure 62 provides for a stay of a final judgment granting an injunction pending appeal. The factors regulating the issuance of a stay are well established:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; *and* (4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987) (emphasis added). The movant must establish *each* of these four elements in order to prevail. *Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir.2000) (*en banc*); *Blankenship v. Boyle,* 447 F.2d 1280 (D.C.Cir.1971) (denying a request for a stay because there was no likelihood of success on the merits, even though the applicant demonstrated irreparable injury).

Contrary to the state's argument, stays are not commonly granted in redistricting, or any other type of litigation. *See United States v. Hamilton,* 963 F.2d 322, 323 (11th Cir.1992) (describing a stay pending appeal as an "exceptional response"). A stay is considered "extraordinary relief" for which the moving party bears a "heavy burden." *Winston–Salem/Forsyth County Bd. of Educ. v. Scott,* 404 U.S. 1221, 1231, 92 S.Ct. 1236, 1241, 31 L.Ed.2d 441 (1971) (Burger, C.J., in chambers). There is no authority to suggest that this type of relief is any less extraordinary or the burden any less exacting in the redistricting context. *Johnson v. Mortham,* 926 F.Supp. 1540, 1542 (N.D.Fla.1996) (three-judge court) (citing the same "extraordinary relief" standard in denying a stay pending appeal of an order striking down Florida's Third Congressional District). As with other types of cases, district courts evaluating redistricting challenges have generally denied motions for a stay pending appeal. *See United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995); *McDaniel v. Sanchez,* 452 U.S. 130, 136, 101 S.Ct. 2224, 2229, 68 L.Ed.2d 724 (1981); *Roman v. Sincock,* 377 U.S. 695, 703, 84 S.Ct. 1449, 1454, 12 L.Ed.2d 620 (1964); *Lodge v. Buxton,* 639 F.2d 1358, 1362 (5th Cir.1981); *Seals v. Quarterly County Court of Madison County, Tenn.,* 562 F.2d 390, 392 (6th Cir. 1977); *Cousin v. McWherter,* 845 F.Supp.

525, 528 (E.D.Tenn.1994); *Latino Political Action Committee, Inc. v. City of Boston*, 568 F.Supp. 1012, 1020 (D.Mass.1983); *see also Wilson v. Minor*, 220 F.3d 1297, 1301 n. 8 (11th Cir.2000) (denying motion to stay district court's order implementing new plan pending appeal). The state's argument that stays are particularly appropriate in the redistricting context is centered around the notion that "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions," *Miller v. Johnson*, 515 U.S. 900, 915, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995), a consideration we contemplated before deciding to grant the plaintiffs relief on the merits. [Order of Feb. 10, 2004 at 42–43]. That standard, which we have already considered in the underlying dispute, seems to be ill-suited to the stay analysis. Accordingly, insofar as granting a stay in *any* type of case "interrupts the ordinary process of judicial review and postpones relief for the prevailing party," *United States v. Texas*, 523 F.Supp. 703, 729 (E.D.Tx.1981), we proceed to consider each of the four factors, mindful of the unusual nature of the relief sought and the demanding burden placed upon the moving party.

### 1. Likelihood of Success on the Merits

■ The first of the four factors, concerning the movant's likelihood of success on the merits, is generally considered the most important. *Garcia–Mir v. Meese*, 781

F.2d 1450, 1453 (11th Cir.1986). A movant seeking a stay pending appeal needs to show a "substantial likelihood of success on the merits." *Siegel*, 234 F.3d at 1176.[1] But, the movant may also establish his burden by showing "a substantial case on the merits" when "the balance of the equities weighs heavily in favor of granting the stay." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir.1981).[2] The more the balance of equities (represented by the other three factors) tilts in respondent's favor, the greater the movant's burden to show a likelihood of success. *Id.* at 565–66. The state in this case is unable to show either a substantial likelihood of success on appeal or even a substantial case on the merits.

Although this case presented some complex questions, we are convinced that the resolution of the dispute fell squarely within long established Supreme Court precedent. The parties presented unambiguous testimony that the population deviations in the House and Senate plans, and the resulting dilution of the right of many citizens to have their votes counted, were in significant part the product of legislators' desire to retain as many seats as possible in rural south Georgia and inner-city Atlanta, even though the populations in those areas no longer warranted the number of seats they have had in the past. [Order of Feb. 11, 2004 at 15–19, 41, 51–52]. This was done contrary to the Supreme Court's clear holding in *Reynolds v. Sims*:

---

1. *Siegel* involved a preliminary injunction. However, the standards used to evaluate a request for a preliminary injunction mirror those used in the context of a stay pending appeal. *In re Forty–Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir.1997); *District 65 Ret. Trust for Members of the Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc.*, 925 F.Supp. 1551, 1570–71 (N.D.Ga.1996); *see Weng v. United States Attorney Gen.*, 287 F.3d 1335, 1338 n. 5 (11th

Cir.2002) (stating the same in the context of a stay pending appeal of an order of deportation).

2. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981.

The fact that an individual lives here or there is not a legitimate reason for over-weighting or diluting the efficacy of his vote.... [T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives.... *A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm.* This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of "government of the people, by the people, [and] for the people." The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races.

377 U.S. 533, 567–68, 84 S.Ct. 1362, 1384–85, 12 L.Ed.2d 506 (1964) (alterations in original) (emphasis added).

Quite simply, "all voters, as citizens of a State, stand in the same relation regardless of where they live." *Id.* at 565, 84 S.Ct. at 1383. "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status." *Id.* at 566, 84 S.Ct. at 1384 (citations omitted). The Georgia plans did exactly that: they systematically and intentionally diluted the weight of people's votes because of their place of residence. The Supreme Court has never receded from this basic principle of constitutional jurisprudence. *See, e.g., Brown v. Thomson,* 462 U.S. 835, 844, 103 S.Ct. 2690, 2697, 77 L.Ed.2d 214 (1983) (upholding a plan because there was "no indication that the larger cities or towns [were] being discriminated against" and "no preference for the cattle-raising or agricultural areas as such"); *Abate v.*

*Mundt,* 403 U.S. 182, 185–86, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399 (1971) (upholding a plan because there was no indication that the plan "was designed to favor particular groups"); *Hadley v. Junior College Dist. of Metropolitan Kansas City,* 397 U.S. 50, 57, 90 S.Ct. 791, 795–96, 25 L.Ed.2d 45 (1970) (striking down a voting plan because that scheme resulted in "a systematic discrimination against voters in the more populous school districts"); *Wells v. Rockefeller,* 394 U.S. 542, 546, 89 S.Ct. 1234, 1237, 22 L.Ed.2d 535 (1969) (striking down a reapportionment plan and commenting that "[t]o accept a scheme such as New York's would permit groups of districts with defined interest orientations to be overrepresented at the expense of districts with different interest orientations"); *Davis v. Mann,* 377 U.S. 678, 692, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609 (1964) (rejecting the "claim that the Virginia apportionment [plan] is sustainable as involving an attempt to balance urban and rural power in the legislature"); *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote ... wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.").

Our judgment in this case simply applies three very well established principles: (1) diluting the weight of a citizen's vote because of place of residence impairs basic constitutional rights, *Reynolds,* 377 U.S. at 566, 84 S.Ct. at 1384; (2) a state must make an honest and good faith effort to achieve districts as nearly of equal population as is practicable, *id.* at 577, 84 S.Ct. at 1390; and (3) when deviations fall below 10%, a plaintiff bears the burden of showing those deviations are the result of an

arbitrary or discriminatory policy, *see Roman*, 377 U.S. at 710, 84 S.Ct. at 1458 (1964). Here, the deviations were below 10% (albeit by only .02%—a change in deviation of .03% would have created a prima facie case of *unconstitutionality*), and the plaintiffs were able to show those deviations resulted in substantial part from a desire to increase the weight of voters in south Georgia and inner-city Atlanta, a policy long held unconstitutional since *Reynolds*. The regionalism bias patently compelled the result because the case law plainly supports the principle that deviations cannot be justified by the application of unconstitutional motives. The state, therefore, has failed to demonstrate a substantial likelihood of success on the merits, or even a substantial case on the merits.

The state's attorneys further confuse the state of the law by arguing that there is no actual and ultimate harm to a group of persons, primarily because the deviations, if supported by a state policy free of arbitrariness or discrimination, would be constitutional. This argument misses the mark on two grounds. First, the fundamental concern here is not with group harms but rather with harms to the individual. This is an Equal Protection, one person, one vote claim—not a gerrymandering claim. *See Reynolds*, 377 U.S. at 561, 84 S.Ct. at 1381 (recognizing that the rights impaired are "individual and personal in nature"). Abridgement of those rights *does* result in unconstitutional harm, and that harm is to the individual voter. *See id.* at 568, 84 S.Ct. at 1385.

Second, the argument that plans with identical deviations would be constitutional, if supported by legitimate state polices, has little bearing on the court's consideration. That motive and intent play a part in this and many other areas of the law is a bedrock principle of constitutional jurisprudence. *See, e.g., Lemon v. Kurtzman*,

403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (requiring consideration of a statute's purpose in the course of a First Amendment analysis); *Reynolds*, 377 U.S. at 565–66, 84 S.Ct. at 1383–84 (stating that debasement of the right to vote occurs when the dilution is based on factors such as place of residence, race, or economic status). The state is entirely correct in stating that plans with total population deviations of 9.98% might be constitutional if they are based on a legitimate state policy that is *not* tainted by arbitrariness or discrimination. But that conclusion does nothing to enhance the state's likelihood of success on the merits, precisely because the deviations at issue in this case *were* plainly driven by both arbitrariness and discrimination.

Although the plans in this case are clearly unconstitutional because the state may not systematically dilute the weight of a citizen's vote based on the fortuity of where he or she may live, the state also has no likelihood of success on the other ground that the deviations were a product of the desire to protect only Democratic incumbents. As was noted in the order of February 10, 2004, the plans attempted to protect Democratic incumbents, at the expense of their Republican counterparts, by placing many Democratic incumbents in underpopulated districts and pitting Republican incumbents against one another in overpopulated districts. In so doing, the state's policy was overexpansive in that it affirmatively attempted to protect only Democratic incumbents, as opposed to a more general (and acceptable) policy of avoiding contests between incumbents. This policy was both arbitrary in its inconsistency of application and discriminatory in its goal of protecting only one political party. It in no way resembles anything the Supreme Court has ever found to be a constitutional justification for population deviations. *See Bush v. Vera*, 517 U.S.

952, 964, 116 S.Ct. 1941, 1954, 135 L.Ed.2d 248 (1996) (recognizing "incumbency protection, at least in the limited form of avoiding contests between incumbents," as a legitimate state interest in defending against a racial gerrymandering claim (citations and quotation marks omitted)); *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) (including "avoiding contests between incumbent Representatives" in a list of legislative policies that might justify minor population deviations in congressional reapportionment plans). Nor is there any indication on this record that the population deviations in the House Plan and the 2002 Senate Plan were the product of an interest in making districts compact, respecting municipal boundaries, or preserving the core of prior districts. Again, the state has failed to show a likelihood of success on the merits, or even a substantial case on the merits.

Furthermore, we are also unpersuaded that the state has a strong likelihood of success on the contention that deviations below 10% fall within a safe harbor or bright line that does not require *any* justification. The Supreme Court has explicitly and repeatedly described the 10% threshold as creating a "prima facie"—that is, rebuttable—presumption of constitutionality, making it quite clear that no safe harbor exists. *See, e.g., Brown,* 462 U.S. at 842–43, 103 S.Ct. at 2696; *Gaffney v. Cummings,* 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973); *see also Daly v. Hunt,* 93 F.3d 1212, 1220 (4th Cir.1996) (explaining that deviations below 10% create only a rebuttable presumption of constitutionality); *Cecere v. County of Nassau,* 274 F.Supp.2d 308, 311–12 (E.D.N.Y.2003) (same); *Montiel v. Davis,* 215 F.Supp.2d 1279, 1285–86 (S.D.Ala. 2002) (three-judge court) (same); *Hulme v. Madison County,* 188 F.Supp.2d 1041, 1047 (S.D.Ill.2001) (same); *Abate v. Rock-*

*land County Legislature,* 964 F.Supp. 817, 819 (S.D.N.Y.1997) (same); *Marylanders for Fair Representation v. Schaefer,* 849 F.Supp. 1022, 1032 (D.Md.1994) (three-judge court) (same).

Indeed, to arrive at the conclusion that the 10% threshold is a safe harbor would require the court to ignore the words "prima facie" in the Supreme Court's analysis in *Brown* and *Gaffney.* By definition, the 10% threshold could not be both a "safe harbor" and rebuttable. *See, e.g., Campaign for a Prosperous Georgia v. S.E.C.,* 149 F.3d 1282, 1284 (11th Cir.1998) (defining a "safe harbor" provision as an irrebuttable presumption). The overwhelming weight of authority supports this decision. That the legislators in this case may have been operating under a mistaken belief that they had the benefit of a 10% safe harbor is immaterial; the case law is decidedly to the contrary. We also remain convinced that the legislature must "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds,* 377 U.S. at 577, 84 S.Ct. at 1390.

The state has failed to show a substantial likelihood of success on appeal or even a substantial case on the merits and is therefore not entitled to a stay. *See Siegel,* 234 F.3d at 1176 (noting that the movant must satisfy each of the four elements). Nevertheless, we examine the remainder of the factors because they too show that the balance of equities favors the plaintiffs and that the public would be decidedly disserved if we were to grant a stay.

### 2. Injury to the Stay Applicant

■ The state contends (1) that the State of Georgia will not be able to both enact plans by March 1, 2004, and get

those plans precleared under Section 5 of the Voting Rights Act by the end of April, when candidates for 2004 elections must qualify; (2) that a court-drafted plan would seriously intrude upon one of the most central political functions of a state—its authority to define how its governing bodies will be elected; (3) that if the state complies with this court's orders and submits constitutionally sound redistricting plans, it is effectively foregoing its right to appeal the decision on the merits; and (4) that in order to obtain timely preclearance of newly drafted plans, the State of Georgia would have to seek review under the Department of Justice's expedited procedures, thereby foregoing its right to seek preclearance through the United States District Court for the District of Columbia.

On the timing issue, we note that both parties have consistently represented to the court that plans drafted by March (if necessary) would be sufficient for use in the 2004 elections. Indeed, the court placed this case on a significantly expedited track for discovery, review of the motions to dismiss and motions for summary judgment, and trial, a schedule that was set with the assistance and continuing participation of *all* counsel in this case.[3] This court has conducted numerous scheduling conferences with the parties' attorneys. [Hearing of August 26, 2003, Tr. at 99–109; Hearing of December 8, 2003, Tr. at 78–91; Conference Call between Judge Pannell and attorneys for all parties, December 18, 2003]. Never once did the state's attorneys represent to this court that this expedited schedule, which called for a trial in the first week of January 2004, would somehow be insufficient to allow for the implementation of new plans in time for the 2004 elections. Thus, for example, at the summary judgment hearing on December 8, 2003, counsel for the plaintiffs indicated her belief that plans would need to be in place by mid-March for use in the 2004 elections. [Hearing of Dec. 8, 2003, Tr. at 90–91]. Counsel for the state never quarreled with that suggestion and did nothing to disabuse the court of the idea that this expedited schedule would allow for the adoption of plans that could be used in 2004. It is late in the day for the defendant to now argue (for the first time in almost one year) that there was never any hope of completing these proceedings in time to craft new plans for the 2004 elections.

Nevertheless, the state has offered two affidavits from Kathy Rogers, the Director of Elections Administration for the Elections Division of the Office of the Georgia Secretary of State. On the day of the stay hearing, the plaintiffs submitted the affidavits of Clark H. Bensen and Lynn Ledford. While it may be inconvenient for the state to comply with the court's order, the deficiencies in the current plans were entirely the result of the State of Georgia's own actions. "It would seem elementary that a party may not claim equity in his own defaults." *Long v. Robinson*, 432 F.2d 977, 981 (4th Cir.1970) (Winter, J., sitting as a single judge). Ms. Rogers also suggests that voters may be confused by the new plans, which could lead to decreased voter turnout. In actuality, there being a presidential election in 2004, voter turnout should be at its highest. *See Vera v. Bush*, 933 F.Supp. 1341, 1349 n. 10 (S.D.Tx.1996) (three-judge court); *Nash v. Blunt*, 797 F.Supp. 1488, 1502 n. 27

---

**3.** On August 29, 2003, the court ordered the designation of experts by September 29, 2003, the completion of discovery and submission of motions for summary judgment by October 28, 2003, the filing of pre-trial stipulations by December 5, 2003, the arguing of motions for summary judgment on December 8, 2003, and the commencement of trial on January 6, 2004.

(W.D.Mo.1992) (three-judge court) (stating that it is "uniformly recognized" that voter turnout is highest when there is a presidential election on the ballot). The expected high turnout, rather than providing a basis for concluding that the state will be irreparably harmed by the potential for voter confusion, actually further amplifies the injury to the plaintiffs and the general public if they are forced again to vote under unconstitutional redistricting plans in 2004. Quite simply, with more of the public voting, even more people will be injured by the current plans if they are used in the 2004 elections than were hurt in the 2002 elections.

Moreover, we are fully satisfied that the state can draft and preclear plans in time for April qualifying. The testimony at trial was absolutely clear that, given recent advances in computer technology, constitutional plans can be crafted in as short a period as one day. Allowing time for the political process, plans can be presented to this court well before the stated deadline of March 1, 2004. Furthermore, the Attorney General has a provision providing for expedited Section 5 preclearance. 28 C.F.R. § 51.34 (2004). Accordingly, the State of Georgia has not been deprived of a reasonable opportunity to create constitutional plans free of federal court intervention. *See Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."). We repeat that only if the state is unable to fulfill its responsibility will this court draft an interim plan, and we continue to urge the General Assembly to adopt new plans.

Nor have the state's attorneys offered any authority for the argument that by essentially restricting the State of Georgia to expedited Section 5 preclearance from the Department of Justice, *see* 28 C.F.R. § 51.34 (2004), it has been deprived of the "right" to seek preclearance from the District Court for the District of Columbia. The Supreme Court has held that when a three-judge court faces a Section 5 challenge, its responsibility is "to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance *as expeditiously as possible.*" *Lopez v. Monterey County,* 519 U.S. 9, 24, 117 S.Ct. 340, 349, 136 L.Ed.2d 273 (1996) (emphasis added). Given the time constraints facing the parties in this case, we have nonetheless afforded the State of Georgia ample opportunity to fashion constitutional plans, *see Wise,* 437 U.S. at 540, 98 S.Ct. at 2497, even if doing so effectively requires the state to choose the administrative preclearance option. *See Rodriguez v. Pataki,* Nos. 02 Civ. 618, 02 Civ. 3843, 2002 WL 1334733, *1 (S.D.N.Y. June 17, 2002) (requiring submission to the Department of Justice for expedited review).

We also observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary. *Sixty–Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 201 n. 11, 92 S.Ct. 1477, 1486 n. 11, 32 L.Ed.2d 1 (1972) ("[T]he district court has the power appropriately to extend the time limitations imposed by state law."); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). So, while the candidate qualifying period is set to

begin on the fourth Monday in April and end on the following Friday, O.C.G.A. § 21–2–153(c)(1) (2003), there is no reason why the court could not extend that period if this proves to be necessary to ensure constitutional elections.[4] In fact, the Georgia General Assembly contemplated precisely that scenario for elections immediately following the redistricting process, establishing a qualifying period for the election year subsequent to redistricting that is substantially later than any dates we are contemplating here. *Id.* (establishing a qualifying period beginning on the third Wednesday in June and ending on the following Friday for elections following redistricting).[5]

The state also argues that it would be effectively forced to forego its right to appeal by having to devise and preclear plans for the 2004 elections. The argument that any appeal would become moot is simply incorrect. In essence, the problem the state complains of is that if it either adopts new plans or implements court-drawn plans, it will not have time to withdraw those new plans before the 2004 elections if this court is reversed on appeal. There is support for the proposition that effective waiver of the right to appeal can constitute irreparable harm. *See Ctr. for Int'l Envtl. Law v. Office of the United States Trade Representative,* 240 F.Supp.2d 21, 22–23 (D.D.C.2003) (stating that disclosure of documents would effectively render any appeal moot). However, the state is *not* being forced to waive its appeal. Even if the state were to devise new plans that were precleared by the Department of Justice, the General Assembly would not be precluded from replacing the interim plans with ones of its own creation if the defendant is successful on appeal. *Cf. Reno v. Bossier Parish School Bd.,* 520 U.S. 471, 485, 117 S.Ct. 1491, 1501, 137 L.Ed.2d 730 (1997) (noting that a plan is still subject to challenge, and therefore inherently subject to being changed, even after it has received Section 5 preclearance).

We are unpersuaded by the state's arguments for two additional reasons. First, the irreparable harm to the plaintiffs, and to all voters in Georgia who have had their votes unconstitutionally debased, outweighs the harm the state may encounter by being unable to resolve an appeal of this decision prior to the 2004 elections. *See Reynolds,* 377 U.S. at 567, 84 S.Ct. at 1384 ("To the extent that a citizen's right to vote is debased, he is that much less of a citizen."); *Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1363 (M.D.Ala.1986)("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance."). Second, as was previously noted in the discussion regarding timing concerns, the state is in this position because its attorneys have continuously led this court to believe that the schedule under which this case proceeded would allow

---

4. Indeed, in her affidavit, Ms. Rogers suggests that the Legislative and Congressional Reapportionment Office would need to receive the maps by February 20, 2004 to meet all of the current election dates and deadlines. [Rogers Aff. at ¶ 20]. If the court were to extend the relevant deadlines, such as the qualifying date and the primary date, by only thirty days, the state would have sufficient time to mail voter registration cards and prepare ballots. [Rogers Aff. at ¶ 10 (noting that the tasks of mailing registration cards and preparing ballots generally take ninety days) ].

5. The record evidence also established that the 2001 House Plan was not precleared until April 5, 2002 and the 2002 Senate Plan was not precleared until June 3, 2002. Nevertheless, the 2002 elections were able to be held in a timely fashion.

for completion of this litigation in time for the 2004 elections. The state's attorneys' claim of purported harm is significantly diminished because they had a full hand in creating the schedule the court adopted. *See Long,* 432 F.2d at 981.

### 3. Injury to Other Parties in the Proceeding

█ Equally importantly, the practical effect of a stay would be that the State of Georgia would conduct the 2004 elections again using unconstitutional apportionment plans. There will not be sufficient time to implement new plans if this action is stayed pending appeal. In fact, the 2002 elections have already been conducted under the unconstitutional plans. If the court permits a stay, thereby allowing the 2004 elections also to proceed pursuant to unconstitutional plans, the plaintiffs and many other citizens in Georgia will have been denied their constitutional rights in *two* of the five elections to be conducted under the 2000 census figures. We are mindful of the Supreme Court's advice in *Reynolds* that "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1393. This case does not involve an imminent, impending election where the state's election machinery is already in progress. *See id.* The election is more than eight months away. Nor do we impose any unreasonable or embarrassing demands upon the state in order for it to comply with any court decrees. *See id.* at 585, 84 S.Ct. at 1394. The General Assembly of Georgia is now in session, and the state has a reasonable opportunity to devise plans of its own. We strongly encourage it to do so. But if it is unable to do so, we have a responsibility to ensure that future elections will not be conducted under unconstitutional plans, a responsibility that cannot be accomplished if a stay is granted. Accordingly, we find that the plaintiffs will be injured if a stay is granted because they will be subject to one more election cycle under unconstitutional plans.

### 4. The Public Interest

The public interest in this case is nearly indistinguishable from that of the plaintiffs. Every citizen who voted in what is currently an underrepresented district suffered an injury in the 2002 elections by having his or her vote count less than the votes of those who lived in overrepresented districts. *See id.* at 561, 84 S.Ct. at 1381 (recognizing that the rights impaired are "individual and personal in nature"). "Full and effective participation by all citizens in state government requires . . . that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less." *Id.* at 565, 84 S.Ct. at 1383. The injuries suffered in the 2002 elections are magnified each time they are repeated. Furthermore, as previously noted, we are mindful that 2004 is a presidential election year, when voter turnout is usually at its highest. *See Vera,* 933 F.Supp. at 1348 n. 10. Accordingly, we find that the public interest will be disserved if we grant a stay, thereby requiring still another election under plans that are clearly unconstitutional.

### B. Conclusion

In short, we hold that the state has failed to satisfy the heavy burden associated with receiving a stay pending appeal. The movant has the burden of establishing each of the aforementioned factors. In fact, the state has established none of

them. There is little likelihood of success on the merits, the state will suffer no irreparable injury as the state has been given a chance to fashion constitutional plans without court intervention, and the plaintiffs and the public stand to suffer considerable continuing injury if they are forced to vote in another election conducted pursuant to unconstitutional districting plans. Because the state can readily craft and implement constitutional plans prior to the April qualifying period, there is no justification that would permit this court to sanction one more election under the present plans. Accordingly, the motion for a stay [172–1] is hereby DENIED.